Good morning, Your Honors. My name is Michael Sherwood. I represent the Center for Biological Diversity and Pacific Rivers Council, plaintiffs in the case below, appellants in this court. I would like to reserve five minutes of my time for a reply. I want to begin by emphasizing what this case is not about, what is not at issue in this case, and that is that the Sierra Yellow-Legged Frog is a desperately imperiled species on the brink of extinction. The Fish and Wildlife Service itself in its 12-month finding, which is at issue in this case, determined that the frog's population has declined by 80 percent, that only remnant populations exist scattered throughout the Sierra Nevada, that it is declining and that the rate of decline continues, the frog may well go extinct in a few decades. The service found all that in the first 19 pages of the 12-month finding, and I should say, by the way, that for anyone who loves wildlife, cares about wildlife, and loves the pristine wilderness ecosystems of the Sierra Nevada, this makes for tough reading. It's heartbreaking to know that this frog, which once was the most abundant amphibian in the Sierra Nevada, is now spiraling towards extinction. Mr. Sherwood, may I just talk to you for a minute about the practicalities of this case, because I'm interested in your views. Let's suppose that you are correct, that the actual decision is inadequate standing alone, and that because it didn't incorporate or refer to or combine itself with information that was in the CNOR before or after, means that it has to go back. Just suppose that. One gets a fairly overwhelming sense that as a practical matter, it's just a technicality, and technicalities are fine and should be recognized, and the service ought to be held to its statutory obligation. But where does this really lead at the end of the day, assuming you're right about the inadequacy? I'm not quite sure I understand your honest question. Are you asking about what the remedy, the appropriate remedy would be? Well, you asked for the frog to be listed. I understand that. But if there is inadequacy in the decision, and if the district court should not have considered the CNOR, either one of them, or the budgetary statement, I've forgotten what it's called, but anyway, if it shouldn't have done that in order to discern what the real reasons for the decision were, one knows what the real reasons for the decision were, even if it technically is deficient. So as a practical matter, what are we doing? I mean, we're sending it back. They'll remedy the deficiency. And where are you at? Where are we at? Well, actually, Your Honor, we believe that this is one of those unusual cases where, assuming all of the, what you've said, where this court should actually do more than simply set aside the warranted but precluded finding and send it back to the agency to do over. We think that the court should actually order the Fish and Wildlife Service to issue a proposed rule listing the fraud, and to do it very quickly, say, within three months of the issuance of the mandate of this court. But you see, that's not, I mean, I guess, I guess I have a hard time seeing how we have expertise either in the fraud or in measuring the exigency with respect to the fraud against agency with respect to a whole lot of other species that are on the plate. Yes. Well, I have two responses to that, Your Honor. First, the, as I said, the 19 pages of the 20-page warranted but precluded finding are not an issue. We're not challenging the warranted portion of the warranted but precluded finding in this case. I know that. So the Fish and Wildlife Service would not have to redo that. There's nothing to reconsider. The studies have all been done. It has also considered, and the way I see this is, you know, they submitted a 28-J letter on Ventura. This is a case where the service actually decided, it's not a case where the service did not make an initial decision. It actually decided that the listing was warranted but it was precluded. Yes. And it actually gave its reasons and it's argued 15 times in its brief that its reasons are adequate and you can be read, the reasons can be read to imply that they're working expeditiously and they're having trouble getting there because of all these court decisions and orders that are actually, as Judge Reimer pointed out, possibly putting species all out of order so that they're having to do some species that's less endangered than the frog at issue here. But the point is they've made their decision and if we send it back, I don't see how they can make any other decision based on the record that they've put in front of us. They are going to have to keep complying with the court orders with the limited resources that they have. So, I mean, I'm just looking at this as a practical matter. If we, I mean, we have a couple of choices here. I mean, we can accept the service and say, okay, it's going to send it back. They're just going to include the two or maybe three now CNOIRs that they want us to consider here and it's in front of us and you can see what their rationale is. Or we can do something that I also feel uncomfortable doing which is saying list the species because you have to list the species once you've found it warranted and then aren't we interfering with the way the service should be operating? I guess all of us are in catch 22 here is what I'm seeing. What the record does not show, I mean, the Fish and Wildlife Service does have all of the court-ordered listings in the record and the supposed costs that it would make to do those listings. What is not in the record is what would be the cost of listing the frog and we submit that that cost would be minimal because they've already done everything they need to do in the 12-month finding. In fact, they've already made the determination as your Honor points out that listing is warranted. What's involved in a listing? What is involved? Yeah. The fish? The habitat determination? They have to do the scientific studies which they've done. They have to go through each of the five listing factors set out in Section 4A of the Endangered Species Act which they've done here in the warranted but precluded finding and then they have to make a determination which they've done that listing is warranted. So to convert what they've already done to a proposed listing rule, all they would have to do basically would be to delete the one short conclusory paragraph at the end of the warranted but precluded finding that said, yes, listing the frog is warranted but it's precluded by these other court-ordered findings. I thought it involved determining the critical habitat, making a critical habitat determination. The Section 4 does require that critical habitat designations are supposed to be done concurrently with the listing of a species. More often than not, however, the Fish and Wildlife Service does not do that. There are a couple of escape clauses in the statute and but basically... But then why do you sue them if they don't? I mean a lot of the litigation is about they didn't designate the critical habitat. That's right and that's the great majority of the court orders relate to critical habitat, some several hundred I think. The listing, the actual listing orders in the fiscal year 2002, which is the year we're concerned about, amounted to nine, nine listing determinations. Critical habitat designations do not count for purposes of the warranted precluded section as Judge Burrell below correctly determined at page seven, footnote four I believe it was of his decision. To continue to answer your question, all they'd have to do is add to the warranted but precluded notice that they've already done a proposed listing rule, which is literally one sentence adding the frog to the list of endangered species. Then they have to solicit public comment for 30 or 60 days and then they prepare a final listing rule, which usually simply recapitulates the proposed listing rule, adds their response to the comments received and then has the final rule. That's it. What would be the effect of that without doing the critical habitat? If you just did that scale down version, which you suggest would be almost no work, incremental from this point, what would then be the effect of the listing? It would be perfectly valid. The fact that they had not designated critical habitat concurrently with the listing might be subject to challenge as a separate matter, but the listing of the frog would be valid. I think it's instructive, Your Honor, to look at the listing rules for the Southern California population of mountain yellow-legged frog, which the Fish and Wildlife Service did list in 2002 as an endangered species. It's threatened by many of the same reasons that the Sierra Nevada population segment is. The proposed listing rule in that is found at 67 Federal Register 71714. Is it attached to one of your briefs? I've seen it, but I think it's attached to one of your briefs. I think the proposed listing was, yes. It is attached to one of our briefs. I don't think that the final listing rule was, however, and that's found at 67 Federal Register 44382, July 2nd, 2002. That final listing rule for the Southern California mountain yellow-legged frog is only about 11 pages long. In the critical habitat section, and this appears in Federal Register page 44390, volume 67, the service concluded that, quote, we will prepare a critical habitat designation for this species in the future at such time when our available resources allow it. That's what they did with the Southern California. They could certainly do that with the Sierra Nevada population of the mountain yellow-legged frog. I won't acknowledge that the possibility that some environmentalists might challenge that finding, but the important thing is that the frog would be listed. It would receive... The possibility of your sitting down with the service and just negotiating that? I don't know. Of course, I don't represent the entire university. We have excellent Ninth Circuit mediators with whom you could sit down with and talk about it. Have you attempted to do a mediation with the Ninth Circuit? No, we haven't, but we've been fighting the service over this for years, not just in this case, but there was an earlier separate case filed by the Center for Biological Diversity against the Fish and Wildlife Service just to pry out the 12-month notice from them. Then there was this litigation. This takes me to the second reason why I think it would be appropriate for this court simply to order the service to issue a proposed rule, which is that if you send it back for them to reconsider, given their sorry track record of delay in this case, we submit that that would simply result in further foot-dragging, more delays, and we just simply don't have the luxury of that kind of time in this case. We're talking about a species that the service itself has declared to be on the brink of extinction that might blink out within a few years, forever, if action is not taken and taken very soon. Counsel, why can't we just take at face value, given what we know about the budgets for various of the agencies having to do with environmental work, that they are underfunded and that they are trying to respond to court orders, which, as you well know, if they don't respond to them, it could lead to contempt. Instead of saying that they're foot-dragging, why can't we just say, take them at their face value and assume that the scientists within the service have the same goal as you, which is to get some of these species who are eminently extinct listed. It would be a good way to go into some kind of a mediation. Well, your question goes to the court orders, Your Honor. One of the things that the court orders, we think that... No, it really goes to, why do you seem to dismiss the idea of going to mediation? You could get your own court-approved settlement through mediation that puts the yellow-legged frog in the Sierra Nevadas higher in priority. Well, first of all, Your Honor, I don't represent the entire universe of environmentalists, and people who are concerned with the frogs. That's the first point. Secondly, there's never been any indication from the Fish and Wildlife Service on their part. They've been intransigent. There's never been any indication of flexibility. I think that the judge in another CBD versus Norton case, the Mexican spotted owl case in the District Court in that quote, and I'm quoting from 304 FEDSUP 2nd 1177, quote, defendant, the Fish and Wildlife Service, does not get to delay fulfilling its statutory obligations until a court orders it to do so, and then seek relief on the basis that it has too many court orders to satisfy. This would essentially reward defendant for shirking its duties under the ESA. We think that if the court ordered the defendants to publish this rule, they would find the relatively small amount of money to do it, and they would do it quickly. Thank you. I would like to reserve some time. Surely. Mr. Shilton. May it please the Court, I am David Shilton from the Department of Justice representing the Fish and Wildlife Service. I want to speak first today about the question of the adequacy of the evaluation that was done and the explanation that was done for the 12-month finding for the frog, and then talk about whether the service considered improper factors that its court ordered deadlines and budgetary limitations, and then also talk a bit about... Well, there's absolutely no question that you did not make any findings on the expeditious resolution. I mean, there just aren't any. In the 12-month finding, there's not an explicit finding on expeditious progress. You're absolutely right. How do you square looking elsewhere in the record with the sanctuary obligation to provide reasons and data with the decision? Well, I think this is kind of a unique situation, because the Fish and Wildlife Service on a yearly basis is making these findings with regard to all of the candidate species. I'm not suggesting that you can't properly rely or use or incorporate by reference or combine with or cut and paste or any of the other ways in which one might incorporate that data, but the statute says you're supposed to do it in a document, mainly so that the And we can know what you're doing without foraging around. That's fair. And I suppose my argument, in a sense, is a bit of a harmless error argument, that if it is errored not to make the express finding, that the public can find it both in the preceding candidate notice review and the one that follows it. I don't know. The problem with that reasoning is, look, I mean, as you heard me talking with Mr. Sherwood, as a practical matter, I think everybody in this room knows what was going on, but maybe it's easier to know what was going on in this case than in any other case, and we're not supposed to do it. But I don't know for a fact exactly what the service relied on when it made its January decision. Probably, probably it relied upon the same kind of stuff that appeared in the previous CNOR. Surely it didn't rely on what was going to be in the 2004 CNR, which came down a year and a half later. So, so we're guessing. Even though it's sensible, yes, we're guessing, and I don't see how we can do that. Well, I think the district court had the administrative record before him, and those were the documents that led up to the 12-month finding, and those included the budgetary worksheets, which showed what else the service was working on and what it planned to do with the fiscal year 2003, the limited amount of money that it had. And so I think from that, the district court could tell whether or not the service was foot-dragging or legitimately working under the limitations that exist, and those are the budgetary limitations and the court-ordered deadlines. Well, how do you make decisions, let's say, between the frog and a cactus and, you know, a striped owl? How do you make those decisions in exigency? We don't know. Well, the service I know you're under the gun. I mean, I'm prepared to accept at face value that the money isn't there to do everything, but how do we know that you're putting, let's say, the frog in its proper place depending upon where its exigency is? Well, the service has its listing priority guidance, which is a biologically-based guidance system. It found in this case that the frog was a number three, and the plaintiffs have not challenged that. How do we know that vis-a-vis other number threes or fours or fives or ones that the frog is getting its sort of due treatment as a three? How do we know that? Well, the record shows that the service does monitor all the candidate species to make sure that there is not something going on during the year before the next candidate review, which indicates that it ought to take some sort of emergency action. So it keeps an eye on these species, but Well, Mr. Shelton, in fact, doesn't the record show that the frog is not being given its due as a three level? No, I don't think so, Your Honor. The plaintiffs have pointed to the chytrid fungus problem with the frog. The service is well aware of that. But it isn't being listed when the service has decided that listing is warranted, which is that's what its due is, right, being listed because the service, you're not backing away from the service's decision that listing is warranted. It is warranted. And then it's a, was it LPN three? Right, right. It's a priority three. No, we're not backing away from that at all. But the fact is that there are over 100 species that are either twos or ones. And so Are they not listed? At this point, they're on the candidate list and they are slowly being listed as funds are available. But you've got to start with the ones and go to the twos. How do we know that from your decision? Well, again, I think you need to look at the candidate notice of review because that's where it's described, which species that the service has proposed for listing, which it has finally listed in the last period that the CNOR covers. Does it impose any kind of a burden, which doesn't leap out at me, to say all of this in the decision? Well, the problem is that there are a lot of species on the candidate notice. And we have to make findings each year for each species that's ever been petitioned. And so you really, to be efficient, to efficiently use your resources, have to make them as a group, generically. Otherwise, the service ends up spending a lot of its scarce resources on, you know, justifying why it can't act. And that's not helping the species. But on your 12-month review that you're obligated to take of all the species that are on this list, I think, of the candidate list, you, in fact, combine your review with the CNORs. I mean, that can't be tough. I'm sorry. My understanding is that in your 12-month reviews of species on the candidate list, you, in fact, combine the CNOR and the review in one document. Yes. That can't be difficult in today's world. I mean, it doesn't even require retyping. It just is highlighting and scooping it out and putting it in a different document. Now, that may be silly, and it may sound kind of silly, but if that's what it takes to comply with the statute, is that difficult? No, but I think that the CNORs do adequately. But we don't know. There's nothing in the – if I just read the decision, which is all I have to read, if I just read the decision, how can I tell that you actually went through the steps that you're now talking about? I don't know that. I think it's just that the way that the service works is through these yearly candidate notices of review, and it's generally understood in the wildlife community that those are the relevant documents, the 12-month finding here, I agree, spent 98 percent of its time talking about the biology of the species. I think that the Fish and Wildlife Service is a biological organization. They didn't spend a lot of time on the precluded reasoning. But given that those findings are made each year generically in the CNOR, I think that the public is aware that that is the place to look for the details on why preclusion. So if we were to disagree, and if we were to say this decision, standing alone, is insufficient, how would you remedy it? What would you do? I think the logical way to remedy it would be in the next CNOR to rectify any of the deficiencies that were found, because if there are deficiencies with regard to the frog, it's likely that those will apply to other Category 3 species. Just to follow up on Judge Reimer's question, do I hear you correctly that if we were to, and I'm not at all necessarily inclined to go this way, but if we were to find that your precluded paragraph was inadequate and we remanded to the agency, what the service would actually do is just go produce 2,000, what are you on, five or six? There will be one coming out at the end of the month. 2,006. Right. So you just produced that. What would you do, what would the service do differently with respect to this 12-month report on the frog? Well, I don't mean to be prestigious, but it would depend on what you told us was wrong. What Judge Reimer is suggesting is wrong is that there's no express analysis of the expeditious progress that you're making with respect to the frog. So you would just not change anything in that document and you would just issue the 2,006 and then mail it to us so we could see that there's progress? Is that what you're telling me? Well, I hasten to point out that the 2002 CNOR, the 2003, they all have explicit expeditious progress findings in them. The only problem here is that we didn't make the explicit finding in the 12-month finding for the frog, but they've been in the CNOR. So if you found that there was some deficiency in that finding, then we would try to address that. Are you talking about the CNOR finding or the 12-month report? It's an issue here. I'm talking about the CNOR. So you wouldn't change the 12-month? You wouldn't change this 12-month decision on the frog if we were to remand? Well, if you were to say that a 12-month finding absolutely has to have a finding on expeditious progress, then we would have to do a new 12-month finding. You wouldn't do anything differently. You would just add a sentence that presumably would come from your 2005 expeditious, express expeditious finding into that precluded analysis, right? Well, perhaps we would do that and refer to the analysis that was there. Or say we expressly incorporate by reference the annual CNORs. Something of that sort, I think, unless the court told us that something more elaborate had to be done. Let me ask you about that. The Ninth Circuit previously has said that your findings have got to show that there was actual preclusion. And the Ninth Circuit put that in italics, the word actual preclusion. So if it's true, as Mr. Sherwood said, that all you had to do was add one extra page and do the listing, you've already done 99 percent of the work. How could it possibly be precluded? Where is the actual preclusion? All you've got to do is say it's listed. And then the taking provisions and all those things trigger. And then you do the critical habitat later. Why isn't that the answer? Well, I think it's a little more complicated than Mr. Sherwood may be. Well, what is the incremental work that needs to be done that is so difficult at this stage? Well, they first have to do the proposed listing. And they have to go through the five factors for listing, make sure that everything is up to date. I'll take about half a page because you've done the work. I've read this, that your biologists did a tremendous job. I've read it. And they've been studying this problem now for about 32 years. So they have studies galore. And they know the problem. They know at least one of the problems of the introduction of those fish. And so this is not something that needs to be studied. You have the information. You could just say it's listed. And then give the public notice, get comment, and list it. Well, we do have to have the comment period. The agency has to respond to the comments. How hard is that? Well, it all takes resources. How much? I mean, how much does that really cost? Because you've got all the scientific data. I would say three-quarters of the work is done. I was talking to my law clerk. We thought we could write a proposed listing in about a couple hours if we were going to do that. And then the notice of public hearing, I'm sure you have that on word processing. You could send that out. And then all you have to do is respond to comments. Well, I'm told by the agency biologists, I ask them that question. This is not in the record. But they told me it costs between $100,000 to $150,000 typically. That's if you don't have all those 32 years of work. No, that's given this amount of work. It includes the responding to comments. And we get comments from all sides here. Publishing costs in the Federal Register. And we have to deal with the critical habitat issue. I don't think we can just blow that off. You have to make it suit if you don't. We have to make a finding that it's not prudent. And we've lost a number of cases on those findings. And so that's not something we can just assume is an easy step. I mean, is the service at all willing to sit down and work out something so that at least the CBD doesn't sue you over the critical habitat, you agree to list, and you get some incremental time, extra time to actually perform the critical habitat, or you separate that work, and they agree not to sue you at that point, you know, until. Well, we're always. I understand you're under-resourced. And so. We're always willing to sit down and mediate. But I don't want to, you know, raise false expectations. Because we are also under the limitation of our own biological priority system. And the fact that the frog is a three makes it difficult and sometimes problematic to settle when there are other species that are higher. Now, that's not to say that we've never done settlements like that. That's really suggesting that this guy be left ahead. But of where he's supposed to be. But that he be treated where he is supposed to be in the ordinary course. Well, you know, I think that there are not a whole lot of options here under the law. We either propose it for listing or we continue to monitor. And if the threat gets high enough, do an emergency listing. But that does require a pretty high level of threat. And as Mr. Sherwood noted, what they found so far is there certainly is a threat of extinction here. But it's within decades. It's not the kind of thing where the bulldozers are standing by. And those sorts of situations where we do emergency listings. So we've got to consider all the other species when we're making a determination what to do about a particular one. And I'd also add that, you know, the fact that doing a listing in this case might be cheaper than some others where we haven't done as much biological work already. Really, that can't be a factor in jumping the priority three species up above a few. Why not? Since one of your explicit factors is that you're under-resourced and you've got to comply with court orders on critical habitat. Why shouldn't the fact that this is less expensive than others weigh into that, what is essentially an economic decision anyway? It's not a science decision. Well, you know, I think the court orders are of a different magnitude. I mean, they're something we have to comply with. I don't think that that would suggest that we could consider other economic sorts of factors. I think we would. You can only consider the economic factors that you choose to consider. Well, the budget is, you know, not like economic impacts. I mean, the budget, we've got the Anti-Deficiency Act. We simply cannot spend money we don't have. So that is sort of a mega factor as are court orders. But I think those are really the only two things that I can think of that trump the biological factors. And I appreciate that this is a dilemma for everyone and that there's no really great answer to flow out of this, but I think that the solution really lies with Congress, if it's anywhere. Congress gave you the money you asked for. You asked for a certain amount, they gave it to you. Why isn't the agency asking for the amount you really need? Well, I think the record indicates that the agency has asked for somewhat more than Congress has allocated. But just as a practical matter, if you ask for a huge amount more, you're going to lose your credibility with Congress. I think that the fact is that Congress in the early 80s imposed a whole lot of mandatory deadlines, and we're now in an era where it's giving us very little money to comply with those deadlines. So that's why I think Congress has spoken. You need to comply, whether it's you need to make the agency run more efficiently. I mean, I don't know, you know, how efficiently is the agency using the money that it's got? Why is it in all these lawsuits anyway? Well, it's in the lawsuits because of the mandatory. It has a backlog because it has for several, several years, maybe decades, not complied with Congress's mandates in terms of time periods and listings and critical habitat requirements. Well, for quite a while, the service took the position that the most efficient way to use its resources was in listing activities, not critical habitat, because it didn't think that critical habitat added that much protection. The courts said, no, you can't do that anymore, several years ago. And that's produced a huge backlog of critical habitat needs, and that's a large part of this problem. But I think we have to look at what the situation is now, what resources the Fish and Wildlife Service has. Can you imagine if every agency in the executive branch came in and said, we can't comply with the law that Congress has in effect because we don't have enough money, and therefore we don't have to comply with the law? What is that about? Well, that's not the point we're making here. I mean, the Congress did say here that the agency could make a warranted but precluded fining. And that's the burden of our claim today, is to simply show that that warranted but precluded fining was reasonable, as the district court found. So it's not a matter that we aren't complying with law, it's simply whether this finding was rational. And I think, in the light of the record, that it was. All right. Can we just have a clear answer on whether you, representing the service, believe or do not believe that some kind of Ninth Circuit-ordered mediation process would be productive, or that you would agree to do it? We'd certainly agree to do it. I would have to talk with the agency to give any kind of indication of how productive it might be. I haven't discussed that with them, but we're always willing to engage in mediation. All right. Thank you, Mr. Sherwood. Thank you. Mr. Sherwood. Thank you. Three points. First of all, the FRAG is, given the listing priority, a number of three. That's a little out of 12, one being the most endangered. That's a little misleading in this case because, as I understand it, a three is the highest number that can be given to a subspecies, which is what the Sierra Nevada frog is. Going to expeditious progress, Your Honors, even if the CNORs, the Annual Notices of Review, were incorporated by reference or otherwise into the 12-month finding, I think it's important to note that the administrative record does not support, those CNORs do not support the agency's finding of expeditious progress. There's an item in the administrative record which is reproduced at our excerpts of record item number 13, a single table that shows listing actions published in fiscal years 1996 to 2003. And if you look at the top line of that table, it shows the number of species listed from 1996  and those numbers have gone down every year. The service did a fairly decent job the first few years. In fiscal year 1997, they listed 157 species and then 40, 50, until fiscal year 2001 when the listings dropped to 14 a year and slowed to a crawl, not coincidentally with the advent of the Bush administration. So while the listings have been going down every year, the backlog of candidate species has been growing and that's what this chart is over here. There's no, unfortunately... I think your time has expired and we're getting a little bit beyond the record also. Okay, but what that's... If anybody has a question, anything else? I just wanted to emphasize that the number of candidate species is growing every year while the list... So that's not expeditious progress. I didn't probably know that. By any manner of means. All right. Thank you, Your Honor. Thank you, Mr. Shultz. Thank you, Mr. Shultz. And the matter, it is argued, will be submitted subject to further order.
judges: Rymer, Wardlaw, Alsup